Filed 2/13/26  P. v. Clamp CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> KENNETH KIRK CLAMP, <br><br>     Defendant and Appellant. | H051545 <br> (Santa Cruz County <br> Super. Ct. No. F19826) |

Penal Code section 1172.6[1] allows a person convicted of murder under an imputed malice theory to petition the sentencing court to vacate the conviction and to be resentenced.  Three criteria apply for a petitioner to establish entitlement to relief, including that "[t]he petitioner could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019."  (*Id.*, subd. (a)(3).)

Following his 2011 conviction for the first degree felony murder and robbery of Elias Sorokin, defendant Kenneth Kirk Clamp petitioned for relief in 2022 under what is now designated as section 1172.6.  The trial court denied the petition after conducting an evidentiary hearing.

Clamp's appeal from the denial of his section 1172.6 petition asserts the trial court erred in concluding he is guilty of murder under current law.  However, he does not specify how he is entitled to relief "because of" recent changes to California murder law.

---

[1] Unspecified statutory references are to the Penal Code.

(§ 1172.6, subd. (a)(3).)  Instead, Clamp contends Sorokin was already dead by the time Clamp arrived at the scene and thus he is not guilty of felony murder.  This matter was argued to and resolved by the jury at trial, by the trial court in a motion for a new trial, and by this court in Clamp's appeal from the judgment.  (*People v. Hunt et al.* (Oct. 30, 2014, H037380 & H038256) [nonpub. opn.].)  As section 1172.6 was not enacted to provide relief for purported errors in the jury's prior factfinding, and Clamp's arguments do not come within the scope of section 1172.6, we will affirm the denial of Clamp's petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual Summary*

Clamp's briefing provides an extended summary of the evidence at trial.  Because we conclude that Clamp's appeal does not assert a proper basis for section 1172.6 relief, we only summarily recount the factual background of this matter.

Stewart Skuba and Kristin Roberts lived in the same house along with other people.  Roberts's father and brother had also recently come to live in the house.

Leading up to the night of July 20, 2009, Skuba told Roberts that a person was coming to the house and Skuba was going to use chloroform to "knock him out so they could jack him."  A person named Adam Hunt was present when Skuba made these comments.

Elias Sorokin arrived at the house that night.  Skuba asked Roberts to go upstairs while Skuba remained downstairs to "handle some business."

While upstairs, Roberts and another person with her heard sounds consistent with a fight coming from downstairs, where the home's garage was located.  Roberts's brother also heard someone getting "beaten up downstairs."  Skuba later came upstairs sweating and looking "freaked out."  Roberts testified that Skuba later said he used chloroform on the person but it did not work so Skuba and Hunt "beat him up."  According to Roberts, Skuba said the victim was in the garage and was "knocked out."

2

Skuba then called a person on the phone, saying: " 'Hey homeboy, get over here. I need your help.' " Later, Roberts heard the front door open and she saw Clamp and Skuba together. Roberts testified that Clamp asked Skuba "if he could live with this for the rest of his life," and Skuba responded: " 'Yes, he knows where my mom lives.' " Clamp told Roberts to clean up blood in the garage while Skuba and Clamp left.

Roberts then saw Skuba walk to the garage with a "big blue blanket." She heard a "dragging sound" and "a big thud and the back of a tailgate shut" before she heard the garage door open and close and the sound of two trucks reversing out of the driveway. After more than an hour, Clamp and Skuba returned to the house. Clamp, Skuba, Hunt, and Roberts divided up Sorokin's marijuana, marijuana pills, and credit cards.

Sorokin was not seen after that night. Sorokin's father filed a missing person's report. In the days after Sorokin was last seen alive, individuals including Skuba and Roberts also used Sorokin's credit cards at various stores. A woman was caught attempting to pass a check purportedly from Sorokin that Skuba gave her.

Sorokin's burned truck was found in a wooded area. Roberts testified that she saw a news report about the truck and Clamp told her he started a forest fire. Blood spatter found in the garage matched Sorokin's DNA profile. A search of Clamp's residence revealed a duffle bag with marijuana and marijuana pills, among other items.

Sorokin's body was not located. Roberts testified that Skuba told her he and Clamp drove to the coast and "they threw [Sorokin] off a cliff and that his body went thudding down." Phone location data for Skuba and Clamp was consistent with the theory that the two drove from Santa Cruz to the coast and then returned about an hour later.

**B.** *Trial Proceedings*

The prosecution charged Clamp with murder (§ 187, subd. (a)), second degree robbery (§ 211), and kidnapping (§ 207, subd. (a)). Clamp was tried jointly with Hunt, who was also charged with murder and robbery.

3

In pretrial motions in limine, Hunt moved to "exclude any statements by Skuba to cooperating co-defendant Kristin Roberts wherein Skuba implicates Mr. Hunt," asserting that any statements by Skuba "must be limited to those statements specifically disserving of Skuba's interest." The factual background in this motion mentioned Skuba's statement to Clamp that Sorokin " 'knows where my mom lives.' " However, Hunt's motion did not specifically ask the trial court to exclude this statement. In a hearing on this motion, the prosecutor asserted this statement was admissible. The court ruled that Roberts' testimony about this statement from Skuba was admissible as a coconspirator's statement under Evidence Code section 1223. The parties did not ask the trial court to rule on the admissibility of Skuba's statement that Sorokin was "knocked out."

At trial, Roberts testified regarding Skuba's statements that Sorokin was "knocked out" and that Skuba could live with his actions because Sorokin " 'knows where my mom lives.' " Counsel for Hunt and Clamp both extensively cross-examined Roberts.

In closing arguments, Clamp's counsel asserted that to summarize "[t]his case in a nutshell," Clamp was not guilty of robbery or murder because Sorokin was not alive when Clamp arrived at the house. Clamp's counsel cited various pieces of evidence throughout his closing argument to assert that Sorokin was killed in the garage before Clamp came to the house. Clamp's counsel also argued that Roberts' testimony about the "knocked out" statement was not credible.

Clamp's counsel argued that the jury could find the evidence presented "two options": one in which Clamp was guilty because "somehow [Sorokin] was alive when Clamp showed up," and a second in which Clamp was not guilty because "[Sorokin] was dead and . . . Mr. Clamp didn't do it, . . . he wasn't there." Clamp's counsel repeatedly stressed that Clamp's guilt or innocence depended on whether Sorokin was alive when Clamp arrived at the house. Counsel argued: "[T]he only way Kenneth Kirk Clamp can possibly be connected to the murder of Elias Sorokin was if [Sorokin] was alive at the time Clamp allegedly shows up at the house, and there is no substantial evidence to

4

support that proposition." Counsel stated that the "bottom line" was that the evidence showed Clamp did not have any contact with Sorokin before Sorokin died.

At the conclusion of his closing argument, Clamp's counsel stated: "If [Sorokin] was killed by Skuba in the garage, then Mr. Clamp is not guilty of murder of any kind. . . . All of the physical evidence and circumstantial evidence points to [Sorokin] being killed in the garage. If [Sorokin] was killed by Mr. Skuba in the garage, then Mr. Clamp is not guilty of robbery. . . . [Y]ou can't commit a robbery on somebody who is already dead. . . . Robbery is committed by the use of force or fear to take something, and that can't happen when the person is already deceased." Counsel stated that "minimally," the prosecution needed to "establish for you that [Sorokin] was alive when and if Mr. Clamp arrived," and that the evidence did not prove this. Counsel argued Clamp was not guilty of the charges because "it's not a reasonable interpretation to think that [Sorokin] even survived the attack in the garage because nothing points to that," stating again that "all the physical evidence in this case points to him being killed in the garage."

The jury convicted Clamp of first degree felony murder and robbery and found true allegations of prior serious felony convictions. The jury deadlocked on the kidnapping charge. The jury convicted Hunt of robbery but acquitted him on the murder charge.

Clamp filed a motion for a new trial. The crux of the motion was Clamp's assertion that Sorokin died before Clamp arrived on the scene, and thus Clamp was not guilty of either robbery or felony murder. The motion stated: "To hold Mr. Clamp liable for the murder of Elias Sorokin requires, at a minimum, proof that he (Elias) was alive at the time Mr. Clamp arrived. Absent proof that he was alive at the time of Mr. Clamp's arrival, the charge of murder must necessarily fall under the weight of reasonable doubt."

The trial court—the same judge who presided over the trial—stated that while "[t]here may be some question in the Court's view" as to whether Sorokin died in the

5

garage before Clamp's arrival, the evidence presented at trial—including Skuba's statement that Sorokin " 'knows where my mom lives' "—convinced the court that "the only reasonable conclusion" is "Sorokin was still alive when Clamp arrived." The trial court stated it "doesn't have a reasonable doubt" on this point. Thus, the trial court denied the motion for a new trial, finding based on its "own independent evaluation of the evidence" that "Sorokin very well was still alive at the time that Clamp arrived and Skuba and Clamp finished him off."

The trial court sentenced Clamp to 85 years to life on the murder count and 25 years to life on the robbery count, with the sentence for the robbery count stayed under section 654.

## C. *Initial Appeal*

Hunt and Clamp appealed. Clamp's primary argument on appeal was that insufficient evidence supported the robbery and murder convictions, asserting "there is not substantial evidence that the victim was still alive when Clamp first became involved in the incident, and that his convictions for robbery and murder, which [were] based on a felony-murder theory, must therefore be reversed." Clamp also challenged the admission of hearsay statements by Skuba, though Clamp did not challenge the admission of Roberts' testimony that Skuba told her Sorokin was "knocked out" and " 'knows where my mom lives.' "

This court affirmed the judgment against Clamp, ordering a modification concerning custody credits and a correction that the sentence on count 2 was stayed pursuant to section 654. (*People v. Hunt et al.*, *supra*, H037380 & H038256.)

This court held: "Substantial evidence supports a finding that defendant Clamp became involved while the victim was alive." Citing Skuba's statements that Sorokin was "knocked out" and " 'knows where my mom lives,' " this court stated: "The logical inference from Skuba's response is that the victim was still alive in the garage after the attack." This court concluded that "substantial evidence supports a finding that the

6

victim was alive *immediately following the attack in the garage*," and "the nature of the conversation between Skuba and Clamp supports an inference that at least one of them did check on the victim and that the victim was still alive at that time." (*People v. Hunt et al.*, *supra*, H037380 & H038256.) This court also concluded Clamp's challenge to hearsay evidence was without merit, and stated that any assumed error in admitting testimony about Skuba's statements was harmless, observing in part that "the specified statements by Skuba did not resolve one of the key issues raised by defendant Clamp – whether the victim was still alive at any point during Clamp's involvement." (*Ibid.*)

### D. *Section 1172.6 Petition*

Effective January 1, 2019, Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437) "significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citations.]" (*People v. Strong* (2022) 13 Cal.5th 698, 707-708.) Senate Bill 1437 added what is now designated as section 1172.6, which provides an avenue for a person convicted in a case involving felony murder, murder under the natural and probable consequences doctrine, or another theory under which malice is imputed to a person based solely on that person's participation in a crime to petition the sentencing court to vacate the conviction and to be resentenced.[2]

Clamp petitioned for section 1172.6 relief in 2022. The prosecution agreed Clamp made a prima facie case for relief. However, the prosecution argued the record proved beyond a reasonable doubt that Clamp was guilty of murder under current law because he was a major participant in the underlying felony of robbery who acted with reckless indifference to human life and because he directly aided and abetted murder, theories of

---

[2] Section 1172.6 was formerly designated as section 1170.95. (Stats. 2022, ch. 58, § 10.) We refer to this statute by its current designation throughout this opinion.

murder that remain valid. The trial court issued an order to show cause and scheduled an evidentiary hearing.

The parties submitted briefing in advance of the evidentiary hearing. The focus of Clamp's brief was his assertion that the evidence at trial did not demonstrate Sorokin was alive at the time Clamp's participation commenced, or that Clamp knew Sorokin was alive at the time. Clamp argued Skuba's statements that Sorokin was "knocked out" and " 'he knows where my mom lives' " did not prove beyond a reasonable doubt that Sorokin was alive when Clamp's participation began. Clamp's brief also objected to the trial court's consideration of these two statements as hearsay.

The prosecution's brief asserted that the law of the case established Sorokin was alive when Clamp became involved in the robbery and murder, because this matter was decided at trial and in Clamp's initial appeal. The prosecution also contended that the trial court could consider the two statements from Skuba because section 1172.6 permitted the court to consider evidence previously admitted at trial. Thus, the prosecution asked the trial court to deny the petition.

In a reply brief, Clamp asserted that Roberts' testimony was not credible because she twice pleaded to felony offenses after Clamp's trial, thus refuting her testimony that she had turned her life around. Clamp requested judicial notice of documents evincing these convictions.

At the evidentiary hearing, both parties otherwise relied on the trial record without submitting new or additional evidence.

The trial court—a different judge than the judge who presided over Clamp's 2011 trial—denied Clamp's petition in a written ruling. The trial court noted the jury convicted Clamp of both murder and robbery, and the robbery conviction required proof Sorokin was alive when Clamp became involved in the robbery. The trial court considered the trial evidence, including Roberts' testimony that Skuba said Sorokin was

8

"knocked out" and " 'knows where my mom lives.' " The court found Roberts' testimony credible.

The trial court stated: "It is reasonable to infer that Clamp would assess the situation that he has been called over, in the middle of the night, to assist with. He without a doubt looked in on Sorokin's condition which is reasonable to expect one would do upon arrival." With respect to Skuba's statements that Sorokin was "knocked out" and " 'knows where my mom lives,' " the trial court observed that the word " 'knows' " indicated Sorokin was still alive when Clamp arrived.

The trial court concluded that Clamp was a major participant in the underlying robbery who acted with reckless indifference to human life. The trial court stated: "Whether Clamp or Skuba rendered final blows to Elias Sorokin or if their wrapping him up and throwing him off a cliff was the final cause of death does not preclude finding beyond a reasonable doubt that Clamp under [section 189, subdivision (e)(3)] was a major participa[nt] in the robbery of Elias Sorokin and acted with reckless indifference to human life. The murder was committed while Clamp was engaged in, or was an accomplice in the commission of a robbery as defined in [section] 211. The mental state necessary . . . has been proven beyond a reasonable doubt." The trial court did not address Clamp's hearsay objections or his request for judicial notice concerning court records involving Roberts.

Clamp then moved for reconsideration, asserting the trial court erred by not ruling on his hearsay objections or request for judicial notice, by not accurately recounting the hearsay testimony, by speculating that Clamp looked in on Sorokin's condition upon arriving at the house, and by failing to consider evidence favorable to Clamp's position, among other arguments. The trial court denied the motion, stating that it thoroughly reviewed the trial record.

This appeal timely followed.[3]

## II. DISCUSSION

We first address several judicial notice requests. Clamp requests that this court take judicial notice of the record in Clamp's original appeal, case No. H038256. The Attorney General joins this request. We take judicial notice of this record. (Evid. Code, § 452, subd. (d)(1).)

Clamp also asks this court to take judicial notice of three sets of documents: (1) documents of convictions Roberts sustained after the original trial in this matter; (2) files and records of Roberts's robbery conviction arising from the events leading to Clamp's convictions; and (3) minute orders and other documents from a probation violation by Roberts shortly before the events leading to Clamp's convictions. The Attorney General does not join these requests for judicial notice.

We deny Clamp's request for judicial notice of the first two sets of documents related to Roberts's criminal convictions. Clamp asserts these documents impact the credibility of Roberts' testimony at trial. These documents are not relevant to our determination of the issues before us because, as discussed below, Clamp's arguments regarding Roberts' credibility are an attempt to revisit factual issues that are unrelated to changes to sections 188 and 189 and were thus conclusively resolved by the final

---

[3] Clamp's reply brief was not timely filed. This court granted Clamp's three requests for extensions of time to file a reply brief, with the due date ultimately extended to March 25, 2025. However, the reply brief was not submitted until more than a week past this date. Along with the reply brief, Clamp's appellate counsel submitted a "Motion to Permit Late Filing." An application for extension of time is the specified method to request relief from a briefing deadline. (Cal. Rules of Court, rule 8.60(c).) However, if good cause exists, this court may relieve Clamp from default for his counsel's failure to request an extension of time. (*Id.*, rule 8.60(d).) Based on counsel's representations in the motion to permit late filing, and to allow this court the opportunity to consider the matters raised in the reply brief, this court grants the motion to permit a late filing and will file the reply brief. We requested and considered supplemental briefing from Clamp and the Attorney General on several arguments raised in Clamp's reply brief.

judgment after trial. (See *State Comp. Ins. Fund v. ReadyLink Healthcare, Inc.* (2020) 50 Cal.App.5th 422, 442 [request for judicial notice denied "on the ground that the materials are not relevant to our determination of the issues on appeal"].) Concerning the remaining set of documents from a probation violation suffered by Roberts, the request asserts that these records are identical to those in an exhibit admitted at trial. Because a trial court at a section 1172.6 evidentiary hearing may consider evidence previously admitted at any prior hearing or trial and because the court here stated it reviewed the trial record, we grant Clamp's request to take judicial notice of this set of documents.

Clamp's final request for judicial notice concerns a brief by the Attorney General in a case pending before the California Supreme Court, *People v. Lopez*, S287814. Clamp asserts that in this brief, "the Attorney General made concessions that are contrary to positions of the Attorney General in the Respondent's Brief in Mr. Clamp's case, regarding cognizability of (a) issues of inadmissible hearsay . . . , and (b) issues of insufficiency of evidence . . . ." The positions taken by the Attorney General in a different case are not relevant to our determination of the issues pending before this court. (See *Center for Environmental Health v. Perrigo Co.* (2023) 89 Cal.App.5th 1, 23, fn. 12 [request for judicial notice of Attorney General's brief in another appeal denied "because whatever the Attorney General's position on this issue may be in a different case is not relevant to our decision"].) We therefore deny this request for judicial notice.

A. ***Legal Principles and Standard of Review***

Senate Bill 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) Accordingly, Senate Bill 1437 amended section 188 to provide: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.

Malice shall not be imputed to a person based solely on his or her participation in a crime." (*Id.*, subd. (a)(3).) Under section 189 as amended, a participant in a listed felony in which a death occurs is only liable for murder if one of the following is proven: "(1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (*Id.*, subd. (e)(1)-(3).)

A person convicted under a theory of imputed malice may file a section 1172.6 petition to seek to have the conviction vacated and to be resentenced on any remaining counts. (§ 1172.6, subd. (a).) A person may file such a petition only when specified conditions apply, including that "[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (*Id.*, subd. (a)(3).)

If the petitioner makes a prima facie case for relief, the trial court conducts an evidentiary hearing. (§ 1172.6, subds. (c), (d).) At the hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (*Id.*, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. . . . The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (*Ibid.*)

"Ordinarily, a trial court's denial of a section 1172.6 petition [following an evidentiary hearing] is reviewed for substantial evidence. [Citation.] Under this

standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' [Citation.] But where there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently. [Citation.]" (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

**B.** *Analysis*

Clamp's section 1172.6 petition and this appeal attempt to relitigate the central question raised at his trial and decided by the jury: whether Sorokin was still alive when Clamp arrived at the house. We agree with the Attorney General that by advancing this challenge to the jury's factfinding, Clamp fundamentally misconstrues the purpose and scope of an evidentiary hearing under section 1172.6 and thus the trial court did not err in denying Clamp's petition. Clamp's remaining arguments fail because they relate to his primary claim that Sorokin died before Clamp arrived at the house.

### 1. *Clamp's assertion that Sorokin died before Clamp arrived at the house is outside the scope of section 1172.6.*

By convicting Clamp of robbery and felony murder, the jury rejected Clamp's assertion that Sorokin died before Clamp appeared. In denying Clamp's motion for a new trial, the trial court concluded based on its own independent evaluation of the evidence that Sorokin was still alive when Clamp's involvement began. In Clamp's initial appeal, this court concluded that substantial evidence supported the jury's finding that Sorokin was alive when Clamp became involved in the crimes. Clamp does not explain how the timing of Sorokin's death is made relevant by recent changes to sections 188 and 189. Instead, Clamp disputes what has already been decided—that Sorokin was alive when Clamp arrived and thus Clamp is guilty of felony murder.

13

"The mere filing of a section [1172.6] petition does not afford the petitioner a new opportunity to raise claims of trial error or attack the sufficiency of the evidence supporting the jury's findings. To the contrary, '[n]othing in the language of section [1172.6] suggests it was intended to provide redress for allegedly erroneous prior factfinding. . . . The purpose of section [1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' [Citation.]" (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947.) Here, Clamp seeks to revisit the jury's factual determination concerning the timing of Sorokin's death, which is not permitted in section 1172.6 proceedings.

Clamp argues, as he did to the trial court, that to prove he is guilty of murder, the prosecution would need to prove "beyond a reasonable doubt that (i) Sorokin was alive at the time Clamp aided Skuba in transporting his body, and (ii) Clamp knew it," and that "[t]here is no evidence of either." But the jury already decided this issue against him. The trial court's denial of Clamp's motion for a new trial and this court's previous opinion upheld the jury's finding in this regard.

To convict Clamp of robbery—and therefore felony murder—the jury necessarily concluded that Clamp formed the intent to rob Sorokin while Sorokin was still alive. "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The California Supreme Court has held that a defendant can be guilty of robbery "[s]o long as defendant formed the intent to take the [victims'] property before killing them . . . ." (*People v. Frye* (1998) 18 Cal.4th 894, 956, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Thus, "one cannot rob a person who is already dead when one first arrives on the scene," though "one can certainly rob a living person by killing that person and then taking his or her property. [Citation.]" (*People v. Navarette* (2003) 30 Cal.4th 458, 499.) Similarly, the California

14

Supreme Court has stated that " 'a victim of robbery may be unconscious or even dead when the property is taken,' " but only " 'so long as the defendant used force against the victim to take the property.' [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 507.) The salient question is whether the "defendant harbored the intent to steal before or during the murder." (*Ibid.*)

The jury could not have convicted Clamp of robbery—or felony murder—unless Clamp formed the intent to rob Sorokin before Sorokin's death. No evidence at trial suggested Clamp formed an intent to rob Sorokin before Clamp arrived at the house. By finding Clamp used force or fear to take property from Sorokin's immediate presence, the jury concluded Sorokin was alive when Clamp arrived and formed his intent to rob Sorokin. Otherwise, Clamp's actions in taking property would have amounted to merely carrying property away " ' "from an unsuspecting and unresisting victim," ' " which does not support a robbery charge. (*People v. Jackson* (2005) 128 Cal.App.4th 1326, 1331.)

The Attorney General argues that the doctrine of issue preclusion prevents Clamp from now asserting that Sorokin was not alive at the time he became involved in the robbery. Principles of collateral estoppel, or issue preclusion, apply in section 1172.6 proceedings. (*People v. Curiel* (2024) 15 Cal.5th 433, 451 (*Curiel*).) " 'As traditionally understood and applied, issue preclusion bars relitigation of issues earlier decided "only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." ' [Citation.] 'The party asserting collateral estoppel bears the burden of establishing these requirements.' [Citation.]" (*Id.* at pp. 451-452.)

15

We do not need to decide whether issue preclusion applies to this case because Clamp's argument that Sorokin was dead before he arrived at the house is outside the scope of section 1172.6. The focus of section 1172.6 proceedings is " 'on evidence made relevant by the amendments to the substantive definition of murder' . . . ." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 952.) A defendant "cannot use a section 1172.6 resentencing hearing to relitigate facts already determined, whether by plea, admission, or verdict. [Citation.]" (*People v. Rodriguez* (2024) 103 Cal.App.5th 451, 458.) By relitigating the question of when Sorokin perished, Clamp is attempting to have "a second bite at the apple," something section 1172.6 does not permit. (*People v. Flint* (2022) 75 Cal.App.5th 607, 615.) Because Clamp's argument does not fall within the scope of section 1172.6, the trial court properly denied the petition regardless of whether issue preclusion bars relitigation of Clamp's issue.

Clamp argues that even if the jury found Sorokin was alive when Clamp arrived at the house, he is still eligible for section 1172.6 relief because there was no evidence that he believed Sorokin was alive when he assisted Skuba in disposing of Sorokin's body. He argues that aiding and abetting murder requires specific intent to kill, and he could not possess such intent if he did not know Sorokin was still alive at the time the body was transported. But the jury convicted Clamp of felony murder, and so long as sufficient evidence supports the trial court's determination that Clamp remains guilty beyond a reasonable doubt on a currently valid theory of felony murder, the alleged absence of evidence to support other theories of murder liability is irrelevant. Felony murder remains a viable theory of murder under current law as long as the requirements of section 189, subdivision (e) are met. Clamp's argument that he is not guilty of murder revolves around his contention that Sorokin was not alive at the time Clamp's involvement began, not any changes to section 189, subdivision (e) or any other recent changes to California murder law. In addition, direct aiding and abetting murder was a valid theory of murder at the time of Clamp's trial, and it remains so today. (See *Curiel*,

16

*supra*, 15 Cal.5th at p. 462.) Clamp fails to show how his state of mind concerning Sorokin's status is relevant to whether he could not presently be convicted of murder "because of" changes to section 188 or 189. (§ 1172.6, subd. (a)(3).)

Clamp raises a number of arguments to assert that the trial court's instructions did not inform the jury that it needed to find Sorokin was still alive to convict Clamp of robbery and felony murder. But if the instructions erroneously stated the requirements for proving felony murder under the law at the time of trial, Clamp's recourse was to raise this issue in his appeal from the judgment. (See *People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921, 936; *People v. Flores* (2023) 96 Cal.App.5th 1164, 1173-1174; *People v. Bodely* (2023) 95 Cal.App.5th 1193, 1205; *People v. Burns* (2023) 95 Cal.App.5th 862, 867-869 (*Burns*).)

In any event, the trial court's instructions did inform the jury that to convict Clamp of robbery and felony murder, it needed to find Sorokin was still alive when Clamp formed the intent to rob Sorokin. The trial court instructed the jury on this issue in three scenarios involving felony murder. If Clamp allegedly committed the fatal act, the trial court instructed the jury that Clamp "must have intended to commit the felony of robbery and/or kidnapping before or at the time that he caused the death." If a coparticipant allegedly committed the fatal act, the trial court instructed that "[t]he defendant must have intended to commit the felony of robbery before or at the time that he caused the death." Finally, if other acts allegedly caused death, the trial court instructed that "[t]he defendant must have intended to commit, or aided and abetted, or been a member of a conspiracy to commit the felony of robbery before or at the time that he caused the death." The jury was properly instructed that to convict Clamp of felony murder, it needed to find Clamp intended to commit, aided and abetted, or conspired to commit robbery before or at the time Clamp caused Sorokin's death.

In addition, even assuming some ambiguity in the instructions existed, Clamp's trial counsel's argument clearly and repeatedly told the jury that Clamp was not guilty of

17

murder if Sorokin died before Clamp arrived at the house, and the prosecutor did not dispute this principle. "When reviewing a claim based on assertedly ambiguous instructions, we inquire whether the jury was reasonably likely to have construed them in a manner that violates the defendant's rights. [Citation.]" (*People v. Friend* (2009) 47 Cal.4th 1, 79.) In assessing the probable impact of a challenged instruction on the jury, we must consider the arguments of counsel. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1005.) Based on counsel's argument, the jury was aware that to convict Clamp of robbery and felony murder, it had to conclude Sorokin was alive when Clamp's participation began.

Clamp does not relate his arguments to the recent changes to California murder law. Clamp's lengthy opening brief does not substantively discuss Senate Bill 1437 or recent changes to California murder law. His argument that he is not guilty of murder based on the timing of Sorokin's death relates to the law as it existed at the time of his trial. This claim is beyond the scope of section 1172.6 proceedings.[4]

### 2. *Clamp's remaining claims similarly fall outside the scope of section 1172.6.*

Clamp's remaining arguments flow from his underlying attempt to relitigate the issue of his guilt based on the timing of Sorokin's death. None of these arguments is redressable in section 1172.6 proceedings.

---

[4] Even if we were to analyze this appeal under the rubric of issue preclusion, the result would not change. The issue sought to be precluded—the timing of Sorokin's death—is identical to that decided at trial. The timing of Sorokin's death was actually litigated at trial. This issue was necessarily decided at trial, for the reasons stated above, and the decision in the former proceeding is final and on the merits. Finally, the party against whom preclusion is sought—Clamp—is the same as the party at trial. (See *Curiel*, *supra*, 15 Cal.5th at pp. 451-452.)

a.  Clamp's claims regarding Roberts's credibility and related arguments are not encompassed by section 1172.6.

Clamp first argues that Roberts's testimony relaying statements from Skuba was not credible, and that even if Skuba made these statements, they do not necessarily prove Sorokin was still alive when Clamp arrived.  Clamp also contends that the physical evidence in the garage demonstrated Sorokin was killed in the garage before Clamp arrived.  Again, these arguments are relevant to whether Clamp participated in a robbery, an issue the jury decided against him.  Clamp made similar arguments at trial and in a motion for new trial, and both the jury and the trial court rejected them.  These challenges thus do not relate to any of the changes in murder liability enacted in sections 188 and 189 and are not relevant to Clamp's eligibility for section 1172.6 relief.

b.  Clamp's arguments concerning the instructions at trial do not warrant section 1172.6 relief.

Next, in arguing that Sorokin died before Clamp arrived at the house, Clamp's reply brief asserts that "[t]here were two legal paths" for the jury to find him guilty of felony murder "without finding the elements of murder as they exist today."  Assuming this claim is not forfeited (see *People v. Oyler* (2025) 17 Cal.5th 756, 848, fn. 46 [arguments raised for the first time in a reply brief are forfeited]), Clamp is not entitled to relief on the merits.  The two "paths" Clamp cites are the natural and probable consequences doctrine, a theory of murder abrogated by Senate Bill 1437, and the trial court's use of CALCRIM No. 1603 (Robbery:  Intent of Aider and Abettor).  The fact that the jury was instructed on the natural and probable consequences doctrine does not mean Clamp is not guilty of another, still-valid theory of murder.  As the trial court found at the hearing on the 1172.6 petition, by forming the intent to rob Sorokin while Sorokin was still alive and then either assisting Skoba by rendering "final blows" to Sorokin or "wrapping him up and throwing him off a cliff," sufficient evidence supports the conclusion that Clamp is culpable for murder—at a minimum—as a major participant in

19

an underlying felony who acted with reckless indifference to human life. This theory of murder remains valid. (§ 189, subd. (e)(3).)

As to the use of CALCRIM No. 1603, Clamp again does not explain how any problem with the instruction relates to changes in California murder law effected by Senate Bill 1437. Clamp cites *People v. Pulido* (1997) 15 Cal.4th 713, 728 to argue that the trial court's use of CALCRIM No. 1603 allowed the jury to find that he "was guilty of aiding and abetting robbery – and thus, of felony-murder based on robbery – even if Sorokin was already dead or there was reasonable doubt." The *Pulido* opinion was issued well before Clamp's trial. Clamp did not object to the instruction at trial or raise this issue in his direct appeal, and he cannot use section 1172.6 proceedings "to resurrect a claim that should have been raised in his . . . direct appeal." (*Burns*, *supra*, 95 Cal.App.5th at p. 865.)

   c. We apply the substantial evidence standard of review to the trial court's ruling.

Clamp further argues that the normal substantial evidence standard of review should not apply due to actions by the trial court that conducted the section 1172.6 hearing and because the parties relied on the original trial transcripts without presenting any live witnesses. Clamp takes issue with aspects of the trial court's ruling denying his petition, such as relying "on a few snippets favorable to the prosecution" and not taking into account evidence allegedly demonstrating Roberts's lack of credibility, not ruling on Clamp's hearsay objections, not considering evidence of Roberts's posttrial legal troubles, and not considering the physical evidence in the garage. These asserted errors do not warrant a departure from the substantial evidence standard.

Even though section 1172.6 does not require any specific format for the trial court to rule upon a petition, the trial court issued a thorough ruling supporting its denial of the petition, discussing the evidence and concluding that Roberts's testimony was credible.

20

The trial court was not required to discuss every piece of evidence that might support Clamp's position that Sorokin was not alive when Clamp arrived.

In addition, numerous courts have rejected Clamp's argument that a lack of live witnesses at the evidentiary hearing calls for a departure from the substantial evidence standard of review. (See *People v. Underwood* (2024) 99 Cal.App.5th 303, 313-314 and cases cited therein.) In enacting Senate Bill 1437, the Legislature provided for a procedure "requiring trial judges to decide the critical factual questions based—at least in some cases—on a cold record." (*People v. Clements* (2022) 75 Cal.App.5th 276, 297.)

Clamp argues the trial court erred by stating in its ruling that Skuba said Sorokin "is" knocked out rather than, as Roberts testified, Sorokin "was" knocked out. This does not require independent review of the trial court's order. The trial court could reasonably conclude that the phrase "knocked out"—which suggested the beating of Sorokin resulted in something less than death—was the most relevant aspect of this statement.

As to Clamp's argument that the trial court erred by not ruling on his hearsay objections, section 1172.6, subdivision (d)(3) allows the trial court at an evidentiary hearing to consider "evidence previously admitted at any prior hearing or trial that is admissible under current law . . . ." Clamp argues the trial court in the section 1172.6 evidentiary hearing could not consider the two statements by Skuba, as relayed through Roberts, that Sorokin was "knocked out" and " 'knows where my mom lives,' " because they were inadmissible hearsay and thus not "admissible under current law."

Numerous courts have stated that section 1172.6 proceedings do not automatically allow a defendant to relitigate the admissibility of evidence that was considered at trial. (See, e.g., *People v. Ramos* (2025) 112 Cal.App.5th 174, 184 [section 1172.6, subdivision (d)(3) addresses the circumstance where "there may be some evidence that was admitted at a prior hearing or trial that would *not* be admissible under current law due to intervening changes in the law"]; *People v. Davenport* (2023) 95 Cal.App.5th 1150, 1158 [rejecting notion that previously admitted testimony "must once again be run

21

through the rigorous filter of the rules of evidence"]; *People v. Robinson* (2024) 106 Cal.App.5th 854, 867 [section 1172.6, subdivision (d)(3) means the basis for evidence previously admitted must "remain[] a valid basis under current law]; *People v. Palacios* (2024) 101 Cal.App.5th 942, 952 (*Palacios*) [following *Davenport*].)

However, we need not decide whether section 1172.6, subdivision (d)(3) allows Clamp to relitigate the admissibility of the two statements Roberts relayed from Sorokin. Clamp sought to preclude the court from considering these statements at the section 1172.6 evidentiary hearing in an effort to demonstrate Sorokin died before Clamp's participation in the crimes began. As discussed above, this matter was decided by the jury at trial and Clamp does not explain how this claim relates to recent changes to California murder law. Because Clamp's argument regarding these two statements does not relate to a proper basis for section 1172.6 relief, any error by the trial court in not ruling on Clamp's hearsay objection at the evidentiary hearing was not prejudicial.

Clamp further contends the trial court erred by not acting on his request for judicial notice concerning court records involving Roberts. Again, however, Clamp's assertions that Roberts lacked credibility are not relevant a basis for section 1172.6 relief. The jury found based on Roberts's testimony that Skuba was still alive when Clamp's involvement in the crimes began, and Clamp does not argue this conclusion is affected by any recent change to California murder law. We have declined to take judicial notice of these documents, and any error by the trial court in not acting on this request for judicial notice was harmless.

### d. Clamp's claim that he received ineffective assistance from his trial counsel's failure to object to statements from Skuba is not cognizable.

Finally, Clamp's reply brief argues his trial counsel was ineffective for failing to object to the statements Roberts testified that Skuba made, i.e., that Sorokin was "knocked out" and " 'he knows where my mom lives,' " and that his counsel in his initial appeal was ineffective for failing to raise this issue. Again, Clamp did not raise this issue

22

in his opening brief. Further, his claim that his trial counsel was ineffective is not cognizable in section 1172.6 proceedings. As discussed, any hearsay objection to this testimony could have been made under the law as it existed at the time of Clamp's trial, and any allegation of ineffective assistance of counsel could have been made in Clamp's initial appeal. Section 1172.6 "does not permit a petitioner to establish eligibility on the basis of alleged trial error. [Citation.]" (*People v. DeHuff* (2021) 63 Cal.App.5th 428, 438, fn. omitted.) Clamp's claim that his trial counsel was ineffective is not properly brought in this section 1172.6 appeal. (See *Palacios*, *supra*, 101 Cal.App.5th at p. 953 [where defendant did not challenge the admissibility of a confession at trial or raise a claim of ineffective assistance of counsel on appeal, such a challenge was not properly brought in section 1172.6 proceedings because "[d]ue process does not require the Legislature or the courts to grant Palacios yet another opportunity to raise the issue"].)

### 3. *Conclusion.*

Clamp's section 1172.6 petition and appeal improperly seek to relitigate the central issue at his trial. Clamp's jury rejected the argument that Sorokin died in the garage before Clamp arrived and thus found Clamp guilty of robbery and felony murder. Clamp does not demonstrate how any change to California murder law affects his culpability for murder. Substantial evidence supports the trial court's denial of Clamp's section 1172.6 petition.

### III. DISPOSITION

The trial court's order denying Clamp's petition for resentencing is affirmed.

23

_____
Greenwood, P. J.

I CONCUR:

_____
Grover, J.

People v. Clamp
H051545

Lie, J., Concurring:

By alleging "he . . . could not currently be convicted of a homicide offense 'because of changes to [Penal Code] Section 188 or 189[1] made effective January 1, 2019' (§ 1172.6, subd. (a)(3))," defendant Kenneth Kirk Clamp "put[] at issue *all* elements of the offense under a valid theory." (*People v. Curiel* (2023) 15 Cal.5th 433, 462 (*Curiel*), italics added.) "[S]ection 1172.6, subdivision (a)(3)'s 'because of' language does not require a showing that a claim to relief under [the statute] arises from *no other* cause—only that the 2019 changes supply a basis for the claim and so are *a* cause." (*People v. Strong* (2022) 13 Cal.5th 698, 712.) "The Legislature's focus on intent" in these 2019 changes to sections 188 and 189 "does not compel a different result." (*Curiel*, at p. 462.) I join in the majority's conclusion that Clamp has not met his burden of demonstrating reversible error in the superior court's denial of resentencing under section 1172.6. But I respectfully disagree with the majority's categorical view of what may be litigated in a merits hearing under section 1172.6, subdivision (d)(3) (section 1172.6(d)(3)), when a petitioner, like Clamp, has made a prima facie showing of entitlement to relief.

To be sure, the scope of a section 1172.6(d)(3) merits hearing will necessarily be informed by what has previously been adjudicated. As the majority observes, section 1172.6 is not intended broadly " ' "to provide a do-over on factual disputes that have already been resolved." ' " (Maj. opn., *ante*, at p. 14, quoting *People v. Farfan* (2021) 71 Cal.App.5th 942, 947.) Nor is section 1172.6 intended to undo the conclusive resolution of identical legal disputes. But our agreement on these principles merely begs the question of what factual findings the jury made in reaching its verdict, what final legal rulings this court made on appeal from the judgment of conviction, and whether these are controlling in our review of this section 1172.6 proceeding. So I do not share

---

[1] All undesignated statutory references are to the Penal Code.

the majority's view that we may—without addressing preclusion—foreclose Clamp from disputing that Elias Sorokin was alive when Clamp arrived on the scene as "outside the scope of section 1172.6." (Maj. opn., *ante*, at p. 16; cf. *Curiel*, *supra*, 15 Cal.5th at p. 451 [explaining that "contours" of issue preclusion doctrine are "informative" when assessing the "effect of prior jury findings in a resentencing proceeding under section 1172.6"].) Rather, the scope of a section 1172.6(d)(3) merits hearing—and by extension what issues we *must* review in Clamp's appeal from the denial of resentencing—requires at least tacit consideration of both issue preclusion (as to the jury's findings of ultimate fact) and law of the case (as to this court's prior resolution of questions of law).

I would respect the trial court's election to avoid applying issue preclusion when it determined that Sorokin was still alive when Clamp joined the robbery in progress, though I believe that the sufficiency of the evidence supporting the trial court's finding has conclusively been resolved by this court's prior decision in *People v. Hunt et al.* (Oct. 30, 2014, H037380, H038256) [nonpub. opn.]. And although I disagree with the majority's view that even Clamp's mental state under section 189 is beyond the scope of the merits hearing, I find sufficient evidence of either reckless indifference to human life or an intent to kill in Clamp's discussion with Skuba before electing to help dispose of their robbery victim.

**A.     *Sorokin's Death***

**1.     *Issue Preclusion***

It would of course be a rare circumstance "in which a relevant jury finding, embodied in a final criminal judgment, would not meet the traditional elements of issue preclusion." (*Curiel*, *supra*, 15 Cal.5th at p. 454; see *Strong*, *supra*, 13 Cal.5th at p. 716.) But the doctrine of issue preclusion is an equitable one, informed by policies favoring " 'preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation.' " (*Strong*, at p. 717;

2

*Curiel*, at p. 454.) So even when the traditional elements of issue preclusion are met, a court may decline to apply preclusion if doing so would not " 'serve its underlying fundamental principles' of promoting efficiency while ensuring fairness to the parties." (*Strong*, at p. 716; *Curiel*, at p. 454.)

The superior court here declined to apply issue preclusion, despite the prosecution's argument that "the court is not in a position to overturn [the] jury finding" that Sorokin "was alive at the time [Clamp] got involved in the robbery." Instead, the court made independent factual findings based on its review of the trial record. Applying issue preclusion on appeal would thus do little to promote efficiency, and I see no reason to override the superior court's implied equitable judgment in not applying issue preclusion and independently deciding the merits: On this record, it would have had reason to be concerned that treating as preclusive the jury's apparent finding as to one count would not ensure fairness, given the seeming contradictions in the jury's decisionmaking. The jury deadlocked on the kidnapping count, which was predicated on the same movement of Sorokin's body that comprised Clamp's major participation in the robbery, and it requested instruction on whether Clamp could be convicted " 'of *another* crime of "accessory after the fact"?' "—the lesser related offense for which Clamp declined to have the jury instructed. The same jury's inconsistent verdicts as to Adam Hunt—convicting him of the predicate robbery but acquitting him of felony murder despite his apparent participation in the beating that preceded Clamp's arrival (maj. opn., *ante*, at pp. 3, 6)—are likewise confounding. (Cf. *Bravo-Fernandez v. United States* (2016) 580 U.S. 5, 21 [declining to apply issue preclusion when the same jury reached inconsistent results that cast doubt on what factual findings the jury " 'actually and necessarily made' "].)

The superior court expressly and independently found "beyond a reasonable doubt that . . . Sorokin was alive when [Clamp] arrived and joined in the robbery criminal enterprise," and "that [Clamp] was a major participant and acted with reckless

3

indifference to Elias Sorokin's life when he aided in the robbery"  In my view, nothing intrinsic to section 1172.6 or its scope forecloses Clamp's appellate challenge to the sufficiency of the evidence supporting these findings, and applying issue preclusion would not serve the doctrine's underlying fundamental principles.  Review of this claim on its legal merits, however, must account for the law of the case set by this court's 2014 affirmance of the original judgment.

### 2.    *Law of the Case*

Other than disputing the admissibility of two discrete out-of-court statements related by Roberts and offering some additional impeachment of Roberts on the collateral point of her substance abuse, Clamp elected to not materially change the body of evidence before the trier of fact.  Now that the superior court has weighed that evidence and found beyond a reasonable doubt both that Sorokin was alive when Clamp undertook to assist Skuba and that Clamp knew Sorokin was alive, Clamp challenges—as a matter of law—whether the court's factual findings are supported by sufficient evidence.  The final disposition of Clamp's original appeal resolves the legal sufficiency of the evidence supporting the first of these findings.

As the law of the case, " '[t]he decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case.' " (*Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491, quoting 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 895, p. 928.)  "Th[is] doctrine is . . . harsh," in that its application matters most " 'when the former rule is deemed erroneous.' " (*Ibid.*; see, e.g., *People v. Stanley* (1995) 10 Cal.4th 764, 786 [treating intermediate appellate decision on suppression denial as law of the case on automatic review of death judgment, despite relevant intervening high court decision limiting parole searches].)  The doctrine will not apply "where its application would result in an unjust decision," but "[t]he unjust

4

decision exception does not apply when there is a mere disagreement with the prior appellate determination." (*Morohoshi*, at pp. 491–492, citing *Stanley*, at p. 787.)

As Clamp observes, the law of the case applies only to questions of law, unlike issue preclusion's application to ultimate facts. But the legal sufficiency of the evidence in support of necessary findings is a matter of law governed by the law of the case (*People v. Barragan* (2004) 32 Cal.4th 236, 246), so long as the subsequent proceeding does not involve new material facts, or evidence, or explanation of previous evidence (*Weaver v. Shell Co. of California* (1939) 34 Cal.App.2d 713, 717; *Joyce v. Simi Valley Unified School Dist.* (2003) 110 Cal.App.4th 292, 303–304; 13 Witkin, Cal. Procedure (6th ed. 2025) Appeal, § 491.)[2] So even though I differ from the majority in believing the superior court was free, within the scope of section 1172.6, to decide the ultimate fact of whether Sorokin was still alive when Clamp engaged in the conduct necessary to be liable for murder under a valid theory, I recognize that we are bound by the law of the case finally established by this court in 2014: "[S]ubstantial evidence supports the finding that [Sorokin] was alive after the attack, including at the point when Clamp arrived," "when Clamp and Skuba had the discussion about [Sorokin] and when Clamp thereafter told [Roberts] to clean up the blood." (*People v. Hunt et al.*, *supra*, H037380, H038256.)

Clamp's evidentiary objections do nothing to make adherence to the law of the case unjust, because they would make no material difference in the evidence before the superior court at the section 1172.6 hearing. Clamp's asking Skuba "if he could live with

---

[2] As the superior court recognized, the law of the case doctrine did not control the superior court's decision at the section 1172.6 merits hearing, because the appellate affirmance resolved only the legal sufficiency of the evidence to support the jury's findings, not whether the evidence compelled those findings as a matter of law. Nor would it preclude a trier of fact from reaching a different assessment of witness credibility, even on substantially the same testimony. (See *Wallace v. Sisson* (1896) 114 Cal. 42, 45.)

5

this for the rest of his life" is nonhearsay in that it asserts no facts; Skuba's response was admissible both for its nonhearsay effect on Clamp's understanding of whether Sorokin was still alive and for its truth as a coconspirator statement in furtherance of enlisting Clamp's participation in the scheme. (Evid. Code, §§ 1200, 1223.) And as this court held in applying the coconspirator exception to the admissibility of Skuba's statements to Roberts, Skuba's statement to Roberts that Sorokin was "knocked out" was integral to a reasonable inference that the totality of Skuba's account of what had happened in the garage was in furtherance of the conspiracy to rob Sorokin. (*People v. Hunt*, *supra*, H037380, H038256.) Because the superior court did not abuse its discretion in relying on these statements, Clamp's claims of evidentiary error supply no equitable basis for avoiding the law of the case.

Nor does Clamp's request for judicial notice of Roberts's checkered posttrial history alter this conclusion. (See maj. opn., *ante*, at p. 10.) Substantial evidence review does not permit a reviewing court to reweigh the evidence or second-guess the fact finder's credibility determinations. (*People v. Jackson* (2014) 58 Cal.4th 724, 749.) It is the sufficiency of the evidence in favor of the judgment that matters in this deferential review, not the availability of contrary evidence.

**B.** **_Clamp's Mental State_**

The jury in Clamp's trial had no need to address, however, whether Clamp acted with reckless disregard for human life in aiding and abetting robbery or intended to aid and abet Skuba in killing Sorokin. Neither issue preclusion nor law of the case in my view relieves this court of the duty to reach the merits of Clamp's claim that insufficient evidence supports the reckless indifference to human life required under current law. Dismissing this aspect of Clamp's claim as beyond the scope of a merits hearing (maj. opn., *ante*, at p. 19) would reduce section 1172.6 to a nullity. (Stats. 2018, ch. 1015, § 1(f) [purpose of Sen. Bill No. 1437 (2017–2018 Reg. Sess.)].)

6

Unlike the question of when and how Sorokin was killed, however, the issue of Clamp's mental state—whether reckless indifference or express malice—is readily established by the question he put to Skuba before agreeing to join the ongoing robbery and disposal of its victim. As the superior court noted in its written order, "This question is in the context of Clamp counseling and discussing the situation during a juncture where a decision is about to be made." Had Clamp believed Sorokin to be dead already, there would be no reason to question whether the " ' "help" ' " Skuba sought from Clamp was the sort that Skuba might regret " 'for the rest of his life.' " Indeed, Clamp's agreement to provide that help after Skuba confirmed its necessity suggests an agreement not merely to rob Sorokin but to commit murder.[3]

I accordingly concur in the judgment.

---

[3] Had Clamp been charged with conspiracy to commit murder under section 182, it might have been immaterial whether Sorokin had already died of his injuries, given this evidence that coconspirators Clamp and Skuba both believed him to still be alive. (*People v. Johnson* (2013) 57 Cal.4th 250, 258; *People v. Liu* (1996) 46 Cal.App.4th 1119, 1131.)

_____
LIE, J.

*People v. Clamp*
H051545